

AO 93 (Rev. 12/09) Search and Seizure Warrant   (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*     )   Case No.   **15 - 1633M**
    2306 West 74th Street                )
    Los Angeles, CA  90046               )
                             )

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

       An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the     Central     District of     California    
*(identify the person or describe the property to be searched and give its location)*:

    See Attachment A

       The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

    See Attachment B

       I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.  Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

       **YOU ARE COMMANDED** to execute this warrant on or before    14 days from the date of its issuance   
                                              *(not to exceed 14 days)*

 ☑ in the daytime  6:00 a.m. to 10 p.m.     ❏ at any time in the day or night as I find reasonable cause has been established.

       Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

       The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
               *(name)*

    ❏ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ❏ for         days *(not to exceed 30)*.
                              ❏ until, the facts justifying, the later specific date of          .

Date and time issued:    9/2/15 @ 11:55am               **ROZELLA A. OLIVER**
                                              *Judge's signature*

City and state:    Los Angeles, California           Honorable Rozella A. Oliver, U.S. Magistrate Judge
                                                   *Printed name and title*

AUSA: J. Wang (x2450)

*AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| *Return* | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

**Inventory of the property taken and name of any person(s) seized:**
[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes). If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

**Certification**  (by officer present during the execution of the warrant)

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.*

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

AUSA: J. Wang (x2450)

# ATTACHMENT A

## PREMISES TO BE SEARCHED

The premises is located at 2306 West 74th Street, Los Angeles, California 90043 (the "SUBJECT PREMISES"). The SUBJECT PREMISES is a one-story unit that is peach and red in color. "2306" is affixed in black-colored numerals on white border, facing north, on a peach and red overhang outside of the front door to the SUBJECT PREMISES. The front door faces north and has a black security gate in front of it. Approximately three windows face north towards West 74th Street. The first window to the east of the front door has a white overhang that faces north towards West 74th Street. The west side of the building has approximately five windows. A driveway along the west side of the house leads up to a black security gate. Beyond the driveway's black security gate, there appears to be a pink and white structure on the southwest side of the SUBJECT PREMISES. On the east side of the SUBJECT PREMISES, there is a brown wooden gate facing north towards West 74th Street that is connected to a wooden fence. The SUBJECT PREMISES includes any parking spaces, garages, storage space, and appurtenances that are associated with the property.

## ATTACHMENT B

I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of

violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography),

2252A(a)(5)(B) (possession of child pornography), and 2251(d) (advertisement of child

pornography), namely:

a.   Child pornography, as defined in Title 18, United States Code, Section

2256(8).

b.   Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, that refer to the possession, receipt, distribution,

transmission, request, trade, transaction, advertisement, production, and/or reproduction of child

pornography, as defined in Title 18, United States Code, Section 2256(8).

c.   Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, that relate to the viewing, sharing, purchasing,

advertisement, or downloading of child pornography, as defined in Title 18, United States Code,

Section 2256(8).

d.   Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, that refer or relate to any production, receipt, shipment,

order, request, trade, purchase, advertisement, or transaction of any kind involving the

transmission through interstate commerce by any means, including by computer, of any visual

depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States

Code, Section 2256.

e.   Any records, documents, programs, applications, or materials, including

electronic mail and electronic messages, tending to identify persons involved in the possession,

**Instrumentality Protocol**

receipt, distribution, advertisement, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, ordering, requesting, trading or any transaction of any kind, in interstate commerce, including by computer, involving any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(B).

   f.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

   g.  Any records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

   h.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to Kik Messenger or the website Omegle.

   i.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

   j.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES.

       **Instrumentality Protocol**

k.      Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital devices found inside the SUBJECT PREMISES.

l.      Any digital device used to facilitate the above-listed violations and forensic copies thereof.

m.      With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

i.      evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.      evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.      evidence of the attachment of other devices;

iv.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.      evidence of the times the device was used;

vi.      passwords, encryption keys, and other access devices that may be necessary to access the device;

vii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.    records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.    <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

3.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar

facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant. If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

   b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

     i.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

     ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

     iii.  The team searching the digital data also may use sophisticated tools, such as forensic hashing tools, to identify child pornography (including, but not limited to, "Encase" and "Forensic Tool Kit," or "FTK"). Forensic hashing is the process of using a mathematical function, often called an algorithm, to generate a numerical identifier for data (such as a particular file). If the data is changed, even very slightly (such as the addition or deletion of a comma or a period), the identifier should change. A hash value can be thought of as a "digital fingerprint" for data. The team searching digital devices in this case will also use a "hash set," which contains the hash values of image and video files associated with known identified victims of child pornography to determine whether these files are stored within a

digital devices. Because this "hash set" is constantly being updated as investigations result in the rescue of children depicted in child pornography images/videos, it will not contain the hash values of all currently identified image and video files. The team searching the digital devices will only use search protocols specifically selected to identify items to be seized under this warrant.

c.     When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

d.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

e.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

f.     If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

g.     If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may

retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

        h.      The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

        i.      Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

        4.      In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

        a.      Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

        b.      Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

        c.      Any magnetic, electronic, or optical storage device capable of storing digital data;

        d.      Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

        e.      Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.      Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.      Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

5.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Sean Lunney, being duly sworn, declare and state as follows:

## I.   **INTRODUCTION**

1.     I am a Special Agent ("SA") with the Department of Homeland Security, Homeland Security Investigations ("DHS/HSI") and have been so employed since June 2010. I am currently assigned to the Child Exploitation Investigations Group ("CEIG"), where I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2252(a) and 2252A. During my tenure with HSI, I have conducted and participated in numerous investigations of criminal activity, including investigations of sexual exploitation of children on the Internet and child pornography transmitted via computer. During the investigation of these cases, I have participated in the execution of numerous search warrants and seized evidence of such violations. I have had the opportunity to observe and review various examples of child pornography in all forms of media, including computer media. I have also successfully completed the ICE Special Agent Training Program at the Federal Law Enforcement Training Center. In this program, I learned about and was evaluated on a number of investigative techniques and subjects, including computer crimes and child pornography crimes.

2.     Through my training and experience, I have become familiar with the methods of operation used by people who are involved with offenses involving the sexual exploitation of children. I have attended training classes and seminars concerning computer crimes and the sexual exploitation of children on the Internet. This training has given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet to further those offenses. My experience in investigations in this regard has supplemented my

understanding of how people involved in offenses relating to the sexual exploitation of children

use the Internet to further those offenses.

## II.   PURPOSE OF AFFIDAVIT

3.      This affidavit is made in support of an application for a warrant to search the

premises located at 2306 West 74th Street, Los Angeles, California 90043 (the "SUBJECT

PREMISES"), more fully described below and in Attachment A, which is attached hereto and

incorporated herein by reference, and to seize evidence, fruits, and instrumentalities, as specified

in Attachment B, which is also attached hereto and incorporated by reference, of violations of 18

U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), 2252A(a)(5)(B)

(possession of child pornography), and 2251(d) (advertisement of child pornography).

4.      The facts set forth in this affidavit are based upon my personal observations, my

training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for

the requested warrant and does not purport to set forth all of my knowledge of or investigation

into this matter.  Unless specifically indicated otherwise, all conversations and statements

described in this affidavit are related in substance and in part only.

## III.   PREMISES TO BE SEARCHED

5.      The premises to be searched is located at 2306 West 74th Street, Los Angeles,

California 90043 (the "SUBJECT PREMISES").  The SUBJECT PREMISES is a one-story unit

that is peach and red in color.  "2306" is affixed in black-colored numerals on white border,

facing north, on a peach and red overhang outside of the front door to the SUBJECT

PREMISES.  The front door faces north and has a black security gate in front of it.

Approximately three windows face north towards West 74th Street.  The first window to the east

of the front door has a white overhang that faces north towards West 74th Street.  The west side

of the building has approximately five windows.  A driveway along the west side of the house

leads up to a black security gate.  Beyond the driveway's black security gate, there appears to be

a pink and white structure on the southwest side of the SUBJECT PREMISES.  On the east side

of the SUBJECT PREMISES, there is a brown wooden gate facing north towards West 74th

Street that is connected to a wooden fence.  The SUBJECT PREMISES includes any parking

spaces, garages, storage space, and appurtenances that are associated with the property.

## IV.   SUMMARY OF INVESTIGATION

6.      As set forth in greater detail below, in August 2015 I learned from HSI

Wilmington, Delaware that they had identified an individual located in the Los Angeles area who

had posted videos of child pornography online.  On July 24, 2015, while acting in an undercover

capacity, HSI Wilmington SA Patrick McCall visited a chat room called "#pedouniverse" on the

Kik Messenger application.  While on Kik Messenger, SA McCall identified user name

"xxjulialolxx" post two videos of child pornography to the chat room.  SA McCall was able to

download and save these videos to an undercover device.  Further investigation revealed that

"xxjulialolxx" resides at the SUBJECT PREMISES.  Therefore, there is probable cause to

believe that someone at the SUBJECT PREMISES has used a digital device to view, trade and

store child pornography, and that there will be evidence of this activity at the SUBJECT

PREMISES.

## V.   DEFINITION OF TERMS

7.      The following terms have the indicated meaning in this affidavit:

a.      The terms "minor," "sexually explicit conduct," "visual depiction,"

"producing," and "child pornography" are defined as set forth in Title 18, United States Code,

Section 2256.

b.      The term "computer" is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

c.      The term "email" (electronic mail) is defined as the text messages sent from one person to another via a computer.  Email may also include files sent as attachments to or embedded within text messages.  Email can also be sent automatically to a large number of addresses via a mailing list.

d.      The term "Internet" is defined as the worldwide network of computers—a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

e.      The term "Internet Protocol" ("IP") is defined as the primary protocol upon which the Internet is based.  IP allows a packet of information to travel through multiple networks (groups of linked computers) on the way to its ultimate destination.

f.      The term "IP Address" is defined as a unique number assigned to each computer directly connected to the Internet (for example, 172.191.142.150).  Each computer connected to the Internet is assigned a unique IP address while it is connected.  The IP address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP address is only assigned for the duration of that online session.

**Instrumentality Protocol**

g.      The term "Internet Service Provider" ("ISP") is defined as a business that allows a user to dial into or link through its computers thereby allowing the user to connect to the Internet for a fee.  ISPs generally provide only an Internet connection, an electronic mail address, and maybe Internet browsing software.  A user can also connect to the Internet through a commercial online service such as AT&T, Verizon, or Time Warner Cable.  With this kind of connection, the user gets Internet access and the proprietary features offered by the online service, such as chat rooms and searchable databases.

h.      The term "Cloud Storage" is defined as a network of online storage where data is saved in virtual storage that is hosted by third parties.  The hosting companies operate large data centers, possibly across multiple servers.  Cloud storage allows users to save files and data online and access their information from anywhere using any digital device with an Internet connection.

## VI.  BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND THE USE OF KIK MESSENGER AS MEANS FOR DISTRIBUTING CHILD PORNOGRAPHY FILES

8.      Based upon my training and experience in the investigation of child pornography and with the Kik Messenger mobile application, and information related to me by other law enforcement officers involved in the investigation of child pornography generally, I know the following information about the use of computers with child pornography.

9.      Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can scan these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, possess, and trade large numbers of child exploitation images and videos with other Internet users worldwide.

10.     Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage"). Computer users frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive. Computer users also often create "backup," or duplicate, copies of their files. In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported. For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain. Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets. Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device. Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

11.     Kik Messenger is an instant messaging application for mobile devices, developed by the company, Kik Interactive, in Waterloo, Ontario, Canada. The application, which is free, has been developed to be compatible with most iOS, Android, and Windows Phone operating systems. Users who download this application are able to transmit and receive messages by using a smartphone's data plan or wireless internet network. Kik Messenger gives subscribers the ability to chat with other Kik Messenger subscribers, as well as share photos, sketches, mobile webpages, and other content. In order to register for Kik Messenger, users must create a unique username and provide an email address. Since its introduction in 2010, Kik Messenger

**Instrumentality Protocol**

has become very popular, currently listing millions of users worldwide who use it for online social interaction.

12.     I know from my training and experience that Kik Messenger is frequently used by individuals who trade child pornography because it is free, simple to set-up, easily accessible, potentially anonymous and allows users to share digital data privately.  Kik subscribers who wish to trade child pornography can send and receive digital media files directly to and from their mobile digital devices.

13.     If a mobile digital device, such as a phone or tablet, is using Kik Messenger via a wireless network, the mobile digital device has an IP address assigned to it while it is on the internet.  Investigators are able to determine the IP address of any digital device used to access the internet.  Investigators can then search public records (e.g., Maxmind.com) that are available on the internet to determine the internet service provider who has assigned that IP address.  Based upon the IP addressed assigned to the digital device, subscriber information can be obtained from the internet service provider.

## VII. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   INFORMATION PROVIDED BY HSI WILMINGTON ABOUT KIK MESSENGER USER "XXJULIALOLXX"

14.     On or about August 17, 2015, I received information about Kik Messenger user "xxjulialolxx" from SA McCall of HSI Wilmington.  From my review of that information, I learned the following, among other things:

a.     HSI Wilmington has been conducting an undercover investigation into child exploitation violations as relating to the use of the Kik Messenger chat application.  During the course of their investigation, on July 24, 2015, an undercover HSI agent, accessing a chat room within the Kik Messenger application, identified Kik Messenger user "xxjulialolxx" as

posting two videos of child pornography to the chat room, where it would be available to be viewed and downloaded by any Kik Messenger user in the chat room.

      b.      On or about August 25, 2015, among other information I received via mail from SA McCall, I reviewed the videos that were posted by user "xxjulialolxx." The video files are described below:

      i.      The video titled, "IMG_2054.mp4" depicts what appears to be a minor female, approximately seven to ten years of age, lying naked on her back on a bed. An adult male is seen masturbating and ejaculating on her mouth.

      ii.      The video titled, "IMG_2064.mp4" depicts what appears to be a naked minor female, approximately seven to ten years of age, performing oral copulation on an erect penis. The adult male is lying down on what appears to be a bed and the minor female is kneeling to the right side of his body. The adult male has his left hand on the top of the minor females head and appears to be directing her head down while she is performing oral copulation. During the video, a minor male, approximately seven to ten years of age, is seen walking into the room that both the adult male and minor female are in. The minor male first was seen in black and white underwear and then continued to dress himself.

      c.      As part of their investigation, HSI Wilmington served a DHS summons on Kik Messenger in Waterloo, Ontario, Canada for all the pictures, videos and IP information for the Kik Messenger users that were chatting and actively trading child pornography, including user "xxjulialolxx." The return of this summons identified the subscriber for "xxjulialolxx" as "Julia." The registration email for user "xxjulialolxx" is "julialol123@yahoo.com." It further identified a majority of the IP addresses, including the IP address at the time of video file postings as 76.90.194.0 (the "Suspect IP Address"). A query of the American Registry for

**Instrumentality Protocol**

Internet Numbers ("ARIN") online database revealed that the Suspect IP Address was registered to the ISP Time Warner Cable and is believed to be located near Los Angeles, California based on Maxmind geolocation of the IP address.

15.     During my review, I also reviewed chat conversations that took place on the Kik Messenger chat room "#pedouniverse." I saw that, between the dates of June 11 and August 3, 2015, user "xxjulialolxx" exchanged the multiple messages on the chat room "#pedouniverse." Some of these messages are listed below:

> xxjulialolxx (06/20/2015 23:40:37 EDT): "Some young kid just jacked off for me on omeglepro."
>
> xxjulialolxx (06/20/2015 23:40:47 EDT): "Too late for me to get my screen recorder."
>
> Xxjulialolxx (06/21/2015 00:08:55 EDT): "Ima start recording."

16.     I also observed multiple thumbnails of videos posted on the chat room that appear to be child pornography. Two of the thumbnails that show videos posted on or about July 24, 2015 14:48:47 EDT and July 24, 2015 14:49:21 EDT appear to be images of the aforementioned files "IMG_2054.mp4" and "IMG_2064.mp4."

17.     Based on my review of these comments made by user "xxjulialolxx," through my training and experience, I believe that user "xxjulialolxx" is recording child pornography material that is being posted within this chat room.

18.     Additionally, based on my training and experience, I know Omegle is a free website that allows users to chat with strangers. A simple click of the mouse takes a user to a virtual chat room where they are paired up with another random user waiting to chat. Topics of conversation can range from current events, music, and sports to other more personal aspects such as sexual topics and personal information. A user has the opportunity to "walk away" from the chat at any moment with a simple click of the mouse. Once an individual walks away, they

can close the website out completely and stop chatting or be paired up with another stranger.  In addition to text chat, Omegle offers video chat.  Video chat provides users with the opportunity to engage in video and text chat.  A camera is typically required for this type of chat; however, Omegle allows users to use virtual webcams, e.g., "Manycam," instead of actual webcams. Based on my experience and training, I know that ManyCam is a third-party software which mimics a webcam and allow its users to either transmit a pre-recorded video or stream an image that is located on the user's computer, instead of a live video feed.

**B.     IDENTIFICATION OF THE SUBJECT PREMISES**

19.     On August 25, 2015, I observed a report detailing a DHS summons served on or about August 4, 2015 to Kik Interactive by HSI Wilmington, requesting that Kik Interactive provide subscriber information for the Kik Messenger user name "xxjulialolxx."  On or about August 6, 2015, Kik Interactive responded to this summons.  According to a report provided by HSI Wilmington, the return included the following information regarding "xxjulialolxx":

| | |
|---|---|
| Name: | Julia |
| Last Name: | (none provided) |
| Email: | julialol123@yahoo.com (unconfirmed) |
| IP's used: | 76.90.194.0 |
| Location: | Los Angeles, US |
| Registered: | 2014/01/18 01:12:19 |
| Device: | Ipod Touch |
| Version: | 8.5 |

20.     The Kik Interactive summons return identifies that basic subscriber information provided by the user, such as first and last name, email address, and link to a current profile picture is not verified by Kik, and they have no way of knowing if the information is accurate.  A "confirmed" email means that the user received a verification email from Kik and then clicked

on the link within the email. In this instance, an "unconfirmed" email address means that the email address is invalid, or the user received the email but did not click on the link within the email.

21. The Kik Interactive summons return also showed that for a majority of the time from July 8, 2015 at 16:27:06 EDT to August 5, 2015 at 23:31:40 EDT, the IP address associated with the "xxjulialolxx" Kik Messenger account was the Suspect IP Address. Additionally, the Kik Interactive summons does not confirm the email address.

22. According to ISP Time Warner, on or about July 24, 2015, the date on which "xxjulialolxx" used the Suspect IP Address to post video files of child pornography, the Suspect IP Address was assigned to a Time Warner subscriber at the SUBJECT PREMISES. More specifically, Time Warner reported that the Suspect IP Address was continuously assigned to the SUBJECT PREMISES beginning on or about November 5, 2012 and was still active as of August 12, 2015.

23. According to a Consolidated Lead Evaluation and Reporting (CLEAR) records check that I conducted on August 17, 2015, Antonio and Mary Holefield live at the SUBJECT PREMISES. On the same date I also conducted and observed records from the California Department of Motor Vehicles (DMV). I observed that both Antonio and Mary Holefield's most recent address are listed as the SUBJECT PREMISES. On August 24, 2015, I observed a vehicle registered to Mary Holefield that was parked in the driveway of the SUBJECT PREMISES. The SUBJECT PREMISES was listed as the registered address for this vehicle.

24. There is probable cause to believe that, in July 2015, Antonio or Mary Holefield, or someone who resides at the SUBJECT PREMISES, distributed two child pornography videos in the chat room #pedouniverse located on Kik Messenger. Furthermore, based upon his or her

**Instrumentality Protocol**

chat history provided to me by SA McCall from Kik Messenger, he or she has led me to believe

that he or she still actively collects child pornography and does so using Kik Messenger. Based

on this information, there is probable cause to believe that Antonio or Mary Holefield, or

someone at the SUBJECT PREMISES is someone with a sexual interest in children and images

of children.

## VIII.   TRAINING AND EXPERIENCE ON INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN

25.    Based on my training and experience, and the training and experience of other law

enforcement officers with whom I have had discussions, I have learned that there are certain

characteristics common to such individuals:

a.    Individuals who have a sexual interest in children or images of children

may receive sexual gratification, stimulation, and satisfaction from contact with children; or from

fantasies they may have viewing children engaged in sexual activity or in sexually suggestive

poses, in person, in photographs, or in other visual media; or from literature describing such

activity.

b.    Individuals who have a sexual interest in children or images of children

may collect sexually explicit or suggestive materials, in a variety of media, including

photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other

visual media.  Individuals who have a sexual interest in children or images of children oftentimes

use these materials for their own sexual arousal and gratification.  Further, they may use these

materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected

child partner, or to demonstrate the desired sexual acts.

c.    If individuals who have a sexual interest in children or images of children

possess "hard copies" of child pornographic material - that is, their pictures, films, video tapes,

magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc. - they almost always keep these copies in the privacy and security of their home.  To the extent hard copies are kept, individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and/or videotapes for many years.

      d.      Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly.

      e.      Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/ collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

      f.      Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

      g.      Because individuals who have a sexual interest in children or images of children value child pornography, even when they erase or destroy a collection of child pornography, they often take steps to rebuild their collection and acquire new child pornography.

      **Instrumentality Protocol**

## IX.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

26.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.      Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden,"

14                          **Instrumentality Protocol**

erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.      The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

      d.      Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often

15          **Instrumentality Protocol**

automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

        e.      Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were

created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

       f.      Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

      27.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## X.   ITEMS TO BE SEIZED

      28.    Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography), and 2251(d) (advertisement of child pornography), will be found at the SUBJECT PREMISES.

## XI.   CONCLUSION

      29.    For all the reasons described above, there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child

               **Instrumentality Protocol**

pornography), 2252A(a)(5)(B) (possession of child pornography), and 2251(d) (advertisement of child pornography), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.

/s/
_____
Sean Lunney, Special Agent
Department of Homeland Security,
Homeland Security Investigations

Subscribed to and sworn before me
this 3rd day of September, 2015.
   2nd

**ROZELLA A. OLIVER**
_____
HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

**Instrumentality Protocol**